[No. G019872. Fourth Dist., Div. Three. Jan. 27, 1999.]

JAMES LAWSON et al., Plaintiffs and Appellants, v.
MANAGEMENT ACTIVITIES, INC., et al., Defendants and Respondents.

COUNSEL

Lisa R. Geraurd for Plaintiffs and Appellants.

Michaelis, Montanari & Johnson, Garry L. Montanari and Wesley S. Wenig for Defendants and Respondents.

OPINION

SILLS, P. J.—

*Introduction and Facts*

In December 1993, a group of employees at a Honda dealership in Santa Ana watched a corporate jet fall out of the sky. They feared the jet would crash into them. They feared injury from the ensuing explosion.

The jet didn't crash into them. Rather, it crashed into nearby ground. Despite their fears, the employees were among the first to arrive at the scene of the crash, to offer whatever assistance they could, and to observe the aftermath.

The employees, led by James Lawson, later sued Management Activities, Inc., and several related entities, the owners and operators of the jet, for the "serious, substantial and enduring mental anguish" occasioned by the crash. The trial court dismissed the case after it sustained a demurrer without leave to amend and Lawson and his coworkers brought this appeal.[1]

If this court were to apply the principles articulated in *Bro* v. *Glaser* (1994) 22 Cal.App.4th 1398 [27 Cal.Rptr.2d 894], Justice McDaniel's tour de force in the area of damages for emotional distress under a negligence theory (the reader should note we do not use the phrase "negligent infliction of emotional distress"), we might end this opinion right here with a summary affirmance.

To oversimplify the *Bro* opinion, emotional distress recovery in negligence falls into two categories, "direct victim" and "bystander" situations, depending on whether the plaintiff suffered emotional distress upon seeing someone else physically hurt—if so, then it is a "bystander" situation, if not, "direct victim." If the plaintiff claims direct victim status, *Bro* divines the

---

[1]The defendants' motion to strike the reply brief as containing facts not in record is hereby denied as moot. Our facts are taken from the complaint, not the reply brief.

requirement that there be *both* a preexisting consensual relationship between the parties (see, e.g., *Bro* v. *Glaser, supra*, 22 Cal.App.4th at pp. 1416, 1427) and the defendant's conduct reach a certain level of outrageousness (see, e.g., *id.* at pp. 1434, 1438-1439, 1441). In the case before us, there is no doubt that there was no preexisting relationship between the parties, much less a consensual one. Nothing comes close to outrageousness. Quite the opposite really: The reasonable inference from the complaint is that the captain of the jet courageously managed to avoid crashing into a populated area.

The plaintiffs, however, argue that their case cannot be shoehorned into the categories of "direct victim" or "bystander" because they feared for their *own* safety in those few horrific moments before the crash. And they point to a body of California case law, most recently relied on by the Ninth Circuit in another airplane crash case, *In re Air Crash Disaster Near Cerritos, Cal.* (9th Cir. 1992) 973 F.2d 1490, to propound the rule that individuals who simply *fear for their own safety* because of a defendant's negligence may always recover for the ensuing emotional distress.[2] We also note that the recent decision in *Wooden* v. *Raveling* (1998) 61 Cal.App.4th 1035 [71 Cal.Rptr.2d 891] takes issue with both the preexisting relationship and outrageous conduct requirements articulated in *Bro* for "direct victim" cases based on fear for one's own safety. (See *Wooden, supra,* 61 Cal.App.4th at pp. 1038-1042.)

We will not attempt, in this opinion, to articulate any great general rules for emotional distress cases—the Supreme Court will have its hands full when, if ever, it attempts to articulate one grand unified theory in the area.[3] We will only decide the case before us, though that requires that we respectfully decline to follow the *Wooden* decision to the degree that its facts—a car crash in which a literal bystander feared for her own safety—might be extrapolated to the airplane crash before us. Applying the standard seven-factor analysis by which our high court has traditionally ascertained duty in tort law, we hold that the duty of care imposed on airplane operators does not extend to the emotional distress suffered by physically untouched spectators of plane crashes, even spectators who, for a brief moment, reasonably fear for their own safety.

---

[2]The *Air Crash Disaster* court categorized the case as a "direct victim" one. (See *In re Air Crash Disaster Near Cerritos, Cal., supra,* 973 F.2d at p. 1494.) There is thus no way that it can be reconciled with *Bro.* Fortunately for us, and as we explain below, we need not attempt to reconcile the two cases. We do not rest our result on simply assigning the plaintiffs' claim to the "direct victim" category.

[3]Perhaps—but only perhaps—the very attempt to articulate one set of consistent common law general rules in the area is a grail which will never be found. Time will tell.

*Back to the Basics*

One observation is necessary at the beginning of any case involving an emotional distress claim based on negligence. When courts use the acronym "NIED" for "negligent infliction of emotional distress" (and they commonly do) they are in danger of falling into a semantic trap. That is, the very fact that there is a handy acronym for an idea may lead, perhaps subconsciously, to giving that idea more credence than it deserves. Here, the danger is treating "negligent infliction of emotional distress" as an independent tort or, at least, an independent tort doctrine, with a life of its own.

■ For example, while the *Wooden* case was careful to recognize that "NIED is simply a species of negligence" (*Wooden* v. *Raveling, supra,* 61 Cal.App.4th at p. 1046), the opinion also casually referred to the "NIED theory" (see *id.* at p. 1041) as if the "NIED theory" were something already firmly established. At the outset we must remind ourselves that, however handy the acronym, as our Supreme Court *has* made abundantly clear, there is no such thing as the independent tort of negligent infliction of emotional distress. (E.g., *Potter* v. *Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 984 [25 Cal.Rptr.2d 550, 863 P.2d 795] ["there is no independent tort of negligent infliction of emotional distress"]; *Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1072 [9 Cal.Rptr.2d 615, 831 P.2d 1197] ["We have repeatedly recognized that '[t]he *negligent* causing of emotional distress is not an independent tort, but the tort of *negligence.*' "]; *Christensen* v. *Superior Court* (1991) 54 Cal.3d 868, 884 [2 Cal.Rptr.2d 79, 820 P.2d 181] ["Negligent infliction of emotional distress is not an independent tort . . . ."]; *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588 [257 Cal.Rptr. 98, 770 P.2d 278] [substantially same as *Burgess*].) Indeed, civilized life would not be possible if there were such a tort. To borrow a phrase from Blake, if tort damages were available for anything which could foreseeably cause our fellow human beings emotional distress, then "who can stand?" No one, saint or sinner, can go through life without "negligently" inflicting emotional distress on others. (Cf. *Fluharty* v. *Fluharty* (1997) 59 Cal.App.4th 484, 495 [69 Cal.Rptr.2d 244] [making point that heartache and pain are inherent in certain human relationships].)[4]

Instead of lumping emotional distress cases under one heading and then, like Einstein, searching for a grand consistent theory to reconcile the cases,

[4]Notwithstanding *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]. *Molien* has become the *Marie Celeste* of emotional distress law: It is an empty vessel, but not yet sunk. While not overruled, its discussion of duty has been limited to its own facts. (*Burgess* v. *Superior Court, supra,* 2 Cal.4th at p. 1074.)

it is more in keeping with the fact that NIED is not a separate doctrine to ask: What are the circumstances under which a plaintiff can recover damages for emotional distress as a matter of the *law of negligence*? It is true that the question, however phrased and whatever its permutations, requires more words than just "NIED," and therefore is more cumbersome to write. But at least the asking of it reminds us what we are dealing with. When the question is asked, a court is not likely to stray too far from the fundamentals of basic negligence law, that is, the " 'traditional elements of duty, breach of duty, causation, and damages.' " (See *Burgess* v. *Superior Court, supra,* 2 Cal.4th at p. 1072, quoting *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d at p. 588.)

■ The question before us, then, is *not* a mechanistic inquiry as to whether fear-for-own-safety cases fall under the rubric of "direct victim," "bystander" or perhaps a third legal category for "zone of danger" (as plaintiffs, understandably afraid that we might follow *Bro,* urge upon us). It is not a matter of simply pigeonholing our facts into some neat legal category. Rather, the fundamental question is whether the duty of care necessarily attendant upon operating an airplane extends as far as those who fear for their own safety in a crash, even though they remain literally untouched.[5]

On that score the answer is no. When this case is looked at in light of the seven factors traditionally used by our Supreme Court to determine the existence of a duty, the balance tips decidedly against liability. ■ The traditional factors are (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that plaintiff suffered injury, (3) the closeness of the connection between the conduct and the injury suffered, (4) the moral blame attached to defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden to the defendant, and (7) the consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. (See *Burgess* v. *Superior Court, supra,* 2 Cal.4th at pp. 1079-1080; *Christensen* v. *Superior Court, supra,* 54 Cal.3d at pp. 885-886; *Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358].)

### The Seven Factors

■ As *Bro* pointed out, foreseeability is of limited usefulness in delineating duty in emotional distress cases. (See *Bro* v. *Glaser, supra,* 22

---

[5]While plaintiffs may have felt some heat, wind and vibration in the few moments before the crash, it would be a gross distortion of their complaint to suggest that they are claiming anything in addition to their emotional distress for being exposed to the possibility of death or injury in an impending plane crash.

Cal.App.4th at p. 1413; see also *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 663-664 [257 Cal.Rptr. 865, 771 P.2d 814] [noting that foreseeability alone is not "useful" in emotional distress cases because it provides no limits on liability for " 'nonphysical harm' "].) Foreseeability is independent of any preexisting relationship which, as the *Bro* court (rightly) points out, provides a natural limitation on liability. It takes no imagination to realize that people on the ground who are close to an airplane crash are going to be very scared. By the same token, while it is foreseeable that the fright will be intense, it is also foreseeable that the actual fright itself will be short lived. What is *not* foreseeable is the severity of people's psychological *reactions* to the crash. Emotional distress is a murky cauldron of actuarial imprecision, inherently limitless. It is also an area of remarkable individual idiosyncracity, with great extremes at either end. The Lord High Executioner in The Mikado was ready to commit suicide if he was rejected by the elderly Katisha[6]; Private Ryan, the fictional embodiment of a generation of World War II veterans, stoically endured the death and dismemberment of close comrades who gave their lives to rescue him, and then went on to live a productive life.[7] At least in the context of the foreseeability factor in emotional distress cases like this one, tort law cannot countenance the doctrine of the "eggshell psyche."

On balance, foreseeability itself does not count for much, one way or the other, on the question of liability for emotional distress to otherwise unhurt bystanders to airplane crashes.

By contrast, the *certainty* of injury is a factor that squarely weighs against liability. Again, the key is the loosey-goosey nature of a pure emotional distress claim. One can *always* worry oneself sick, almost as a matter of will. The reality of psychological injury remains—and perhaps, despite CAT scans, PET scans, MRI's and who knows what the future holds, always will remain—a subject of intense philosophical debate. There is always the suspicion that extending the tort duty gives plaintiffs an incentive to malinger or worry themselves into a state of depression. Suffice to say for purposes of *this* case that *certainty* of injury is something that we do not have. Yes, the question of the reality of injury can go to a jury, but that is not

---

[6]The story is in the Titwillow song near the end of the operetta. (Gilbert & Sullivan, The Mikado (1885).)

[7]See Saving Private Ryan (Dreamworks SKG 1998); compare Speir, *Application and Use of Post-Traumatic Stress Disorder as a Defense to Criminal Conduct* (June 1989) 1989 Army L. 17, 17 (noting that "most people" do not develop posttraumatic stress disorder after extremely traumatic events).

the point. Psychological symptoms are much more susceptible to being faked than more palpable effects.[8]

The third factor is the closeness of the connection between the defendant's conduct and the injury suffered. Here, the factor certainly does tilt in the direction of liability. There is no reasonable doubt that being near a plane crash and fearing for one's own safety during those few terrible moments before the crash is going to be traumatic. The factor is ameliorated somewhat, however, by the differences in psychological constitutions among people. Some people will act heroically in situations of disaster—indeed, it appears that the plaintiffs, regardless of how traumatized they were from the few moments of fear *before* the crash, summoned up great courage in going *to* the crash after they realized they were out of danger. One cannot predict, for example, how many people in the vicinity of a plane crash are already predisposed to depression, or—because of their own unique experiences—are inclined to fall to pieces in any disaster, act heroically, or, as the complaint suggests here, act heroically and then go into depression. There will always be some trauma, of course. How *much*, again, is unpredictable.

The fourth factor is the moral blame attached to the defendant's conduct. This factor weighs heavily against liability. Plane crashes, much more so than car crashes, tend to be fatal. There is far more reckless driving than reckless flying. Plane crashes are usually the result of some tragic error in the maintenance or operation of the plane—at worst, negligence in light of a very high standard of required performance—rather than any kind of moral indifference to the possibility of injury. Nothing is to be gained by extending the liability attendant upon air crashes to the emotional distress of ground spectators.

Next there is the policy of preventing future harm, to which the same considerations apply as moral blame. The high likelihood of death and the inevitable liability which will come to those physically affected is more than sufficient to deter "future harm." Beyond that, there is a regulatory apparatus devoted to air safety which, in quality and intensity of care, is already

---

[8]For example, see *People* v. *Lockett* (1983) 121 Misc.2d 549 [468 N.Y.S.2d 802], in which the court accepted a plea bargain in a criminal case based on the defendant not being responsible because he was suffering from posttraumatic stress disorder (PTSD) induced by his service in Vietnam while he was in the Air Force. When his Air Force file was examined it turned out that he had never been in Vietnam. (See *id.* at pp. 803-804.) See also Speir, *Application and Use of Post-Traumatic Stress Disorder as a Defense to Criminal Conduct, supra*, 1989 Army L. 17, 19 ("The ease with which a savvy defendant can fake PTSD symptoms has been recognized by medical researchers, and there are documented instances in which a defendant's plan to fake PTSD to avoid conviction was frustrated only by his own indiscretion. [Fn. omitted.]").

disproportionate to the safety apparatus which regulates automotive traffic.[9] Extending liability for plane crashes to emotionally distressed bystanders—bystanders in the literal sense—accomplishes virtually nothing in the way of marginally increased deterrence.

The final two factors—the extent of the burden to the defendant and the general macroeconomic consequence (if we may be so bold as to so characterize the final factor) to the community—also weigh against liability. The actuarial unpredictability of emotional distress damages could add significantly to the cost of insuring air transportation. A federal district court summed up the problem nicely when it declared: "This Court is not prepared to extend [the airline's] direct duty to all the non-passengers it's [*sic*] planes fly over on a daily basis. To hold airlines responsible for the possible emotional injury for such a large and indeterminate group of people would be to expose airlines to 'virtually limitless . . . tort liability.' " (*Air Crash Disaster at Cove Neck Long Island, N.Y.* (E.D.N.Y. 1995) 885 F.Supp. 434, 440.)

Air crashes are inevitably going to be very expensive disasters. They usually make the newspapers in a way that car crashes don't. Most air crashes are going to involve some collateral damage to surrounding property and pose a serious risk to bystanders of *tangible* harm from flying debris. The demands on the insurance pool for recovery are going to be correspondingly greater, and in a context where insurance availability is going to be exhausted. Extending liability to those who suffer the emotional distress of several moments of fear just before the crash will merely dilute the pool of recovery, as well as make air transportation harder to insure.

In short, the factors which determine duty weigh, on balance, against liability for emotional distress damages to otherwise unhurt bystanders. What factors tilt in the direction of liability don't tilt very far; the factors against weigh decidedly against.

### Prior Cases and the "Zone of Danger"

In *In re Air Crash Disaster Near Cerritos, Cal., supra,* 973 F.2d 1490, a couple at home heard two loud noises and suffered severe shock and fright

---

[9]See Note, *Solving America's General Aviation Crisis: The Advantages of Federal Preemption Over Tort Reform* (1995) 80 Cornell L. Rev. 747, 749 ("General aviation is one of the most intensely regulated industries in the United States. Since its enactment of the Federal Aviation Act of 1958, Congress has regulated nearly every aspect of the manufacture and operation of general aviation aircraft for the purpose of ensuring 'the highest degree of safety.' [Fns. omitted.]"). The "crisis" in the title refers to the strains on American aircraft manufacturers created by conflicts between state tort law and federal regulations.

when two airplanes collided in midair and crashed one hundred yards away. The Ninth Circuit concluded that California law would permit the couple to recover for their emotional distress damages, albeit with one judge dissenting because the couple did not actually witness the crash.[10] (See *id.* at p. 1491 & fns. 1 & 2.) In doing so, the Ninth Circuit relied on a series of cases which can appear, at least on first blush, to support the broad proposition that California tort law permits recovery for emotional distress whenever one reasonably fears for one's own safety. And indeed, the dissenting judge nicely encapsulated what her colleagues were saying when she wrote: "As Judge Canby explains, for years the California courts have recognized recovery for emotional distress on account of reasonable fear for one's own safety. See *Lindley v. Knowlton* 179 Cal. 298, 176 P. 440 (1918); *Webb v. Francis J. Lewald Coal Co.,* 214 Cal. 182, 4 P.2d 532 (1931), *partially overruled on other grounds,* San Francisco v. Superior Court, 37 Cal.2d 227, 231 P.2d 26 (1951); *Cook v. Maier* 33 Cal.App.2d 581, 92 P.2d 434 (1939); *see also Amaya v. Home Ice, Fuel & Supply Co.,* 59 Cal.2d 295, 300-04, 29 Cal.Rptr. 33, 379 P.2d 513 (1963) (acknowledging *Lindley* and *Webb* but declining to extend recovery to fear for safety of others), *partially overruled by Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968); *Vanoni v. Western Airlines,* 247 Cal.App.2d 793, 56 Cal.Rptr. 115 (1967). These cases have never been overruled, and I agree with the majority that they remain good law." (*In re Air Crash Disaster Near Cerritos, Cal., supra,* 973 F.2d at p. 1494 (dis. opn. of Rymer, J.).)

With due respect to the Ninth Circuit, we must disagree that California tort case law may be read for the broad proposition that emotional distress damages are available *whenever* one reasonably fears for one's own safety because of the negligence of another, regardless of actual circumstances or context. The proposition is simply too broad. A moment's reflection should reveal that there are too many situations in modern life when one can reasonably be scared for one's own safety. Permitting a lawsuit for just that fright would clog the courts and make transportation and commerce impossible. Duty is a question of law which depends on the " 'foreseeability of the risk and upon a weighing of policy considerations for and against the imposition of liability.' " (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d at p. 588, quoting *Slaughter* v. *Legal Process & Courier Service* (1984) 162 Cal.App.3d 1236, 1249 [209 Cal.Rptr. 189].) The law can hardly permit a major tort suit for unpredictable emotional

---

[10]See 973 F.2d at page 1496, making the point that no California case had "gone so far" as to allow emotional distress recovery "when the causal link between the event and the threatened injury is not contemporaneously comprehended" (dis. opn. of Rymer, J.).

distress damages for every near-miss and otherwise uneventful unsafe lane change.[11]

Scratch a great legal problem and you are likely to find a great philosophical problem. The question of emotional distress damages implicates nothing less than the mind-body problem in philosophy.[12] We are not about to try to solve that great quandary here,[13] but there is no way one can read the cases in the emotional distress area without recognizing that the mind-body problem was the core preoccupation of the fear-for-one's-own-safety cases relied on by the Ninth Circuit in *Air Crash Disaster Near Cerritos.* Those cases were not classic "duty cases," in the tradition of *Burgess, Christensen* and *Biakanja.* Rather, the focus of those cases was merely the rejection of a *per se rule* against *physical damages arising out* of emotional distress given the particular facts at hand.

---

[11]Breathes there a soul who has not witnessed an accident or two over the past few years? Or at least had a driver come speeding up from behind and momentarily worried that a crash was imminent? The bottom line of our dissenting colleague's analysis is that all witnesses to an accident who momentarily fear for their safety but who otherwise escape—indeed, those who fear for their safety even when there is no accident but merely a close call—may sue the wrongdoer for money as compensation for emotional distress. Wow! If this were the law, insurance premiums would skyrocket and the courts would groan from the sheer weight of litigation. The ultimate lawyers' paradise would have arrived: everyone would be suing everyone.

[12]This is hardly esoteric stuff. The law reviews are full of it. Plug in "mind" "body" "Plato" and "dualism" in just the same sentence into a law review data base and you will find no less than 74 documents. (E.g., Barresi, *Advocacy, Frame, and the Intergenerational Imperative: A Reply to Professor Weiss on "Beyond Fairness to Future Generations"* (1998) 11 Tul. Envtl. L. J. 425, 428 [reference to "Cartesian dualism, the tendency inherent in Western thought to erect a philosophical barrier between mind and body, between matter and spirit, and between the physical world and the intellectual one"]; Miller, *DNA Blueprints, Personhood, and Genetic Privacy* (1998) 8 Health Matrix 179, 190-191 [contrasting views of Aristotle, Descartes and Hume on the self]; Sells, *Saving Icarus* (Feb. 1998) 23 Mont. Law. 1, 26 [reference to "the tired dualism of matter and spirit"]; Smith, *Machine Intelligence and Legal Reasoning* (1998) 73 Chi.-Kent L. Rev. 277, 279 ["Descartes' error was in concluding that intelligence can exist independently of the human body"]; Handsley, *Mental Injury Occasioned by Harm to Another: A Feminist Critique* (1996) 14 Law & Ineq. J. 391, 467, fn. 333 ["Liberal philosophy also rested on the 'metaphysical dualism' of the mind-body split."].)

[13]Justice Puglia opined in *Merenda* v. *Superior Court* (1992) 3 Cal.App.4th 1, 8 [4 Cal.Rptr.2d 87] that the "disparate" body of cases dealing with emotional distress damages is not really amenable to a "tight, coherent, conceptual scheme." The difficulty of the *philosophical* problem provides a clue as to why it has been so difficult for the courts to propound a unified *legal* theory when it comes to emotional distress—why, for example, some of the opinions seem to labor (e.g., "Justice Spencer agonized as she worked through an exhaustive discussion of the authorities" [*Bro* v. *Glaser, supra,* 22 Cal.App.4th at p. 1419, referring to *Schwarz* v. *Regents of University of California* (1990) 226 Cal.App.3d 149 [276 Cal.Rptr. 470]]) in the area. When the core issue is one over which some of the finest minds in human intellectual history have disagreed (e.g., Descartes and Hume), jurists are not necessarily going to have an easy time of it either.

The fountainhead case in the area is the late 19th century decision, *Sloane v. Southern Cal. Ry. Co.* (1896) 111 Cal. 668 [44 P. 320]. Indeed, plaintiffs rely on *Sloane* here. *Sloane* involved a claim for mental suffering on the part of a passenger on a train who tried to travel from North Pomona to San Diego via San Bernardino. On the Pomona-San Bernardino leg of the trip a conductor took her ticket, but gave her no transfer ticket or receipt. She had to change trains in San Bernardino, but she was forced to leave in East Riverside when the conductor on that train found she had no ticket. She walked to her sister-in-law's in Colton from East Riverside, and later sued the railroad. After a relatively large award against the railroad for its "wrongful acts committed . . . in violation of its contract" (*id.* at p. 677) (so large, in fact, that the award itself was reversed by the Supreme Court, see *id.* at pp. 687-688), the railroad appealed the judgment on the ground that "mere mental anxiety, unaccompanied with bodily injury or apprehended peril, does not afford a right of action." (*Id.* at p. 679.) The high court's answer to the contention was: The plaintiff wasn't suing for *mere* mental anxiety, but *physical* harm as well. "The real question presented by the objections and exception of the appellant is, whether the subsequent nervous disturbance of the plaintiff was a suffering of the body or of the mind. The interdependence of the mind and body is in many respects so close that it is impossible to distinguish their respective influence upon each other. It must be conceded that a *nervous shock or paroxysm*, or a disturbance of the nervous system, *is distinct from mental anguish*, and falls within the physiological, rather than the psychological, branch of the human organism." (*Id.* at p. 680, italics added.)

The passage from *Sloane*, if read carefully, suggests that the Supreme Court casually accepted an almost "Cartesian" view that there is a mental world wholly divorced from the physical body, but simply located the particular damages in the *Sloane* case on the "body" side of the divide. Thus the implication was that if the damages were really "mental" there would have been no recovery. (Cf. *Fluharty* v. *Fluharty, supra*, 59 Cal.App.4th 484, 498 (dis. opn. of Raye, J.) [reference to "the angst of earlier years when claims for emotional distress were met with universal disdain"].)

The other cases relied on in *Air Crash Disaster Near Cerritos* simply repeated the *Sloane* rationale. That is, these courts assumed that the trauma leading to the emotional distress caused some unspecified "nerve damage" or "shock to the nerves" which took the case out of the emotional and into the physical.

In *Lindley* v. *Knowlton* (1918) 179 Cal. 298 [176 P. 440], a 165-pound chimpanzee attacked the plaintiff's children. The plaintiff had to fight the

chimpanzee off. (See *id.* at p. 299.) The defendant argued the injuries were solely mental (*ibid.*), which the court, quoting *Sloane*, rejected, reasoning that the " 'nerves and nerve centers of the body' " were " 'part of the physical system.' " (*Lindley, supra,* 179 Cal. at pp. 300-301, quoting *Sloane* v. *Southern Cal. Ry. Co., supra,* 111 Cal. at p. 680.)

*Webb* v. *Francis J. Lewald Coal Co.* (1931) 214 Cal. 182 [4 P.2d 532, 77 A.L.R. 675] gave the same cursory treatment to the problem. There a truck collided with a street car, then smashed into the front of a building. A woman working on the mezzanine floor of the building experienced "an immediate nervous collapse," which then led to "continued extreme nervousness, headaches, sleeplessness, [and] loss of weight." (*Id.* at p. 184.) Most of the opinion centered on a physician who had examined the plaintiff but whom the defendant sought to have testify. In a short paragraph near the beginning (and in several paragraphs devoted to showing harmless error after the discussion involving the physician) the court simply assumed that the plaintiff's "physical condition" had been implicated (see *ibid.*) because the "injury complained of was to the nervous system of respondent." (*Id.* at p. 187.)

*Cook* v. *Maier* (1939) 33 Cal.App.2d 581 [92 P.2d 434] followed the same suit. A car crashed into another, ran up onto a vacant lot, collided with a trash burner, then ran into a rock and board fence and the corner of plaintiff's house, causing debris to be thrown in the direction and " 'about the person' " of the plaintiff, who was on her way to the trash burner. (*Id.* at p. 582.) The court framed the question as whether "damages may be permitted for physical injuries as the result of fright and nervous shock, without bodily contact." (*Id.* at p. 584.) Against a premise that "[f]right alone is not an 'injury,' " the court juxtaposed the idea that there was "[s]omething *more* than mere fright" alleged. (*Id.* at pp. 583, 584 italics added.) And again, relying on *Sloane*, that "something more" was damage to the nervous system.

Ditto *Vanoni* v. *Western Airlines* (1967) 247 Cal.App.2d 793 [56 Cal.Rptr. 115]. There a commercial airliner was being flown in such a manner (the opinion doesn't say exactly how) as to cause its passengers to fear it was going to crash. (*Id.* at p. 794.) The court operated from the premise that "there can be no recovery for emotional distress or mental suffering unaccompanied by physical harm arising from acts which are solely negligent in nature" (*id.* at p. 795), then set about—again via a quotation from *Sloane* (see *id.* at p. 796)—to decide the case on the ground that " 'shock' " created by the fear really was a "physical injury" as distinct from an emotional or mental one. (See *id.* at p. 797.)

Thus, when our Supreme Court had occasion, in *Thing* v. *La Chusa, supra,* 48 Cal.3d 644, to describe *Webb* and *Lindley*, it said that they represented *"physical injury* as a *result* of the emotional trauma." (*Id.* at p. 651, italics added.) The court might as well have said the same thing about *Sloane, Cook* and *Vanoni.*

If the rationale of the *Sloane-Lindley-Webb-Cook-Vanoni* cases seems strained, it is because it is, and the time has come to recognize that fact. The emotional distress-nerve damage dichotomy can be misleading. Since nerves carry all sensory phenomena to the brain, *every* stimulus is going to have a "physical" effect in terms of actual signals transmitted through the nervous system. This means that every stimulus generating an emotional effect— which is pretty much *all* stimuli—can also be said to lead to a "physical" effect, and therefore constitute a "physical" injury. *Any* emotional distress can be styled "nervous shock." Yet it cannot be denied that there is a difference between a pinched nerve and one which has been a conduit for an emotionally traumatic experience based on fright. In one, the harm is direct, centered on the nerve itself. In the other, the trauma is based on how the *brain interprets* certain stimuli, as distinct from the stimuli itself.[14] The nervous-shock-equals-physical-injury rationale swallows up any distinction between what the ordinary person would think of as emotional distress (without convoluted references to nerve synapses) and (for want of a better word) "hard" or *palpable* damages, like an ensuing heart attack.

The point may be illustrated by reference to what one might think is the ordinarily prosaic world of insurance coverage law. For years, one of the great "recurring issues" in liability insurance coverage was whether the words "bodily injury" in a commercial general liability (CGL) insurance policy obligated an insurer to cover claims arising out of economic or business torts where the *bodily* injury claim was based on emotional distress. (See *Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 10 [44 Cal.Rptr.2d 370, 900 P.2d 619].) It is now settled that the words do not so obligate. Thus a company founder who was upset that he was forced out of the company he built (*Waller, supra,* 11 Cal.4th at p. 30); investors, includ- ing many senior citizens, who lost their life savings in investment scams (*Keating* v. *National Union Fire Ins.* (9th Cir. 1993) 995 F.2d 154, 156; *Chatton* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846 [13 Cal.Rptr.2d 318]); and an employee who was left without health insurance when she got into an auto accident (*Aim Insurance Co.* v. *Culcasi* (1991) 229

[14]For example, in the case before us, an employee sitting in an isolated and soundproof conference room might have been wholly oblivious to the impending crash. For those who became aware of the impending crash, the shock value depended on the *brain* to interpret certain stimuli as possible impending death.

Cal.App.3d 209 [280 Cal.Rptr. 766]) were all held *not* to have stated claims for "bodily injury."

Yet can it be denied that people who have lost their economic hopes and security, or who are left in the lurch without health insurance and who are then injured in an accident are going to experience some "physical" manifestations of their emotional distress? Sleepless nights, heart palpitations, a horrible feeling in the pit of one's stomach—these are "bodily" phenomena if one were to take the words "bodily injury" with a dogged literality. Certainly one must experience "nervous shock" upon hearing that one's life savings have been sunk into a worthless investment. The point is, as the *Molien* decision alluded to, the "attempted distinction between physical and psychological injury" is artificial; one cannot extrapolate the "nervous shock" rationale into infinity or there will be no limits on liability. (See *Molien* v. *Kaiser Foundation Hospitals, supra,* 27 Cal.3d at pp. 929-930.)

In short, there is no shortcut to analyzing the actual duty and the gravamen of the claim in each case. There are cases where "shock" is clearly not compensable and cases where maybe it should be. Teenagers have been known to get heart palpitations when their boyfriends or girlfriends leave them. On the other hand, pregnant women have been known to suffer miscarriages when they witnessed their spouses injured in a car crash (e.g., *Reed* v. *Moore* (1957) 156 Cal.App.2d 43 [319 P.2d 80].) The law obviously must differentiate between the two.[15]

■ Cases are not authority for propositions which they did not decide. (*Roberts* v. *City of Palmdale* (1993) 5 Cal.4th 363, 372 [20 Cal.Rptr.2d 330, 853 P.2d 496].) ■ While the *Sloane-Lindley-Webb-Cook-Vanoni* line of cases equated emotional distress with "nervous shock" and nervous shock with the sort of palpable physical injuries that no one would question were recoverable, none of them ever considered the crucial question we have before us: The duty of an airplane operator vis-à-vis otherwise untouched bystanders for emotional distress, regardless of whether that emotional

---

[15]Which is not to say that even in the latter situation the courts have had an easy time of being consistent. *Reed* actually held that the woman could *not* recover because the negligent act was not "directed at" her, but at her husband, which is how the Court of Appeal distinguished *Sloane*. (*Reed* v. *Moore, supra,* 156 Cal.App.2d at p. 45.) But then again, as Justice Peters noted in his *dissent* in *Amaya* v. *Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295, 318 [29 Cal.Rptr. 33, 379 P.2d 513], the facts in *Amaya* (mother witnessed truck run over her boy) were "very close" to *Reed,* which also held there could be no recovery, yet *Amaya* was overruled by *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 748 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] (mother witnessed child killed by negligent driver). Fortunately, the present case can be dealt with without proposing a grand scheme trying to reconcile everything that the Supreme Court and various panels of the Court of Appeal have ever written on the subject.

distress can be artificially characterized as "nervous shock."[16] Indeed, neither did the Ninth Circuit in *Air Crash Disaster Near Cerritos*. Rather, the Ninth Circuit simply assumed that because California courts had allowed, in Judge Rymer's words, recoveries "for emotional distress on account of reasonable fear for one's own safety," plaintiffs could recover. There was no consideration of the scope of duty of an airplane operator.[17]

Ironically, the recent decision of *Wooden* v. *Raveling, supra,* 61 Cal.App.4th 1035 follows much the same pattern. The facts in *Wooden* are reminiscent of *Webb*, i.e., a car crash that comes onto the plaintiff's property and placed the plaintiff in fear of personal injury. (See *Wooden, supra,* 61 Cal.App.4th at p. 1036.) Just as *Sloane, Webb* and *Lindley* were content to rebut the idea that the plaintiff was *merely* seeking emotional distress, *Wooden* rested its decision on rebutting the requirements articulated in *Bro*. The *Wooden* decision is essentially devoted to the idea that the requirements which the *Bro* court articulated for so-called "direct victim" liability for emotional distress damages are inconsistent with *Potter* v. *Firestone Tire & Rubber Co., supra,* 6 Cal.4th 965. We will not now try to figure out which of the two cases represents the better view, which case is more consistent with *Potter*, or whether the two cases might be reconciled. We do not rest our decision on the *Bro* requirements.

It is enough, rather, simply to note two aspects of the *Wooden* decision which distinguish it from the case at hand. One, there is a difference between car crashes and airplane crashes as they relate to bystanders. Automobile drivers necessarily must be highly aware of the surrounding area and nearby property through which they drive. Freeways pose different risks than residential streets. Children might dart out into a narrow alley; one must drive slowly to avoid them. No such necessity attaches on a wide stretch of open highway in the desert.

The risk to bystanders is different in air travel. Most of the time, after all, when a plane is flying, the safety of bystanders on the ground is irrelevant

---

[16]Thus our decision today might be different if the plaintiffs had all suffered heart attacks. However, we need not address the problem of whether a "hard" or palpable phenomenon, like a heart attack, brought on in a bystander to a plane crash by fear of being hurt in a plane crash, is recoverable. We need only note that the number of otherwise untouched bystanders who suffer heart attacks as a result of the fear of being hurt in a plane crash is going to be far fewer than the number of otherwise untouched bystanders who, as in the present case, really suffer only fear itself.

[17]Our dissenting colleague acknowledges that the 1896 *Sloan* decision is not "precisely" on point, but extrapolates the principle of liability on which that decision was based into an inflexible rule which mandates liability for mere fear any time there is negligent conduct. As we have already indicated, that broad idea is untenable in the light of what our high court has said in the 100 years since that venerable case.

from the point of view of the operators and owners of the plane. It is only relevant when a crash is otherwise inevitable.

Two, *Wooden* did not analyze the bystander's fear for her own safety in context of the seven factors which our high court has traditionally used to delineate duty. The case thus hardly stands for the proposition that these seven factors would mandate a broad or inflexible fear-for-one's-own-safety or "zone of danger" rule, particularly as regards an air crash case.

In sum, case law does not require imposition of a duty on operators of airlines to avoid the emotional trauma inherent in any crash to otherwise unhurt bystanders. We write on a clean slate.

*Disposition*

The judgment is affirmed.

Bedsworth, J., concurred.

**SONENSHINE, J.,** Dissenting.—

STANDARD OF REVIEW

This case comes to us after the trial court sustained the defendants' demurrers due to the plaintiffs' failure to state a cause of action. We therefore accept the allegations of the pleadings as true. (*Angie M.* v. *Superior Court* (1995) 37 Cal.App.4th 1217, 1223 [44 Cal.Rptr.2d 197].)

ALLEGATIONS CONTAINED WITHIN THE PLEADING

The plaintiffs' first amended complaint alleges: "The events giving rise to this cause of action occurred . . . when a WESTWIND JET crashed while approaching for landing . . . . [¶] . . . Plaintiffs . . . were at the time . . . employed by . . . a car dealership . . . . [¶] . . . and . . . present [there when they] . . . [¶] . . . observed the . . . JET begin to descend, falling out of the sky. The plaintiffs watched the WESTWIND JET crash into the ground. Prior to the . . . crash[], the plaintiffs were fearful . . . the . . . Jet, or parts of it, would land on them and cause them serious injury. [¶] . . . Plaintiffs watched the . . . JET explode and, in fact, felt the force and heat of the explosion, the force of which caused them to be thrown forward as they ran from the scene of the crash. The plaintiffs also feared that they might be further harmed by the force and/or heat of the explosion as well as debris flying from the explosion site." The complaint further alleges, "As a proximate result . . . , plaintiffs suffered serious, substantial and enduring mental anguish and emotional distress which injured their health, strength and

activity, sustaining injury to their body and shock and injury to their psyche and person, all of which said injuries have caused and continue to cause plaintiffs great mental and physical pain and suffering. [¶] . . . As a further proximate result of the negligence and carelessness of defendants, and each of them, plaintiff has incurred and will continue to incur, medical expense and costs of drugs and supplies. . . . [¶] . . . At the time of said injury, plaintiffs were employable and as a proximate result of said conduct of the defendant(s), and each of them, and by reason of the injuries suffered by plaintiffs, they were prevented from being employed, thereby losing earnings. Plaintiffs are informed and believe, and thereon allege, that they will continue to be prevented from attending to their occupations for a period in the future, and will thereby lose future earnings."

### THE ALLEGATIONS STATE A CAUSE OF ACTION

The majority concludes the plaintiffs failed to state a cause of action because California does not recognize emotional distress damages for airplane crash spectators who suffer no physical harm.[1] My colleagues fail to appreciate the controlling law.

Over 100 years ago, our Supreme Court recognized, "A shock to the nervous system may be caused either by some physical impact *or* by fright caused by exposure to imminent peril." (BAJI No. 12.81 (7th ed. 1986 bound vol.), italics added; see *Sloane* v. *Southern Cal. Ry. Co.* (1896) 111 Cal. 668, 682-683 [44 P. 320].) Moreover, for several decades our highest court has permitted plaintiffs to recover damages for emotional distress resulting from fear of imminent peril. And this has been true even where there are no physical injuries. Indeed, the Supreme Court recently reiterated this very point. " '[D]amages for negligently inflicted emotional distress may be recovered in the absence of physical injury or impact . . . .' [Citation.]" (*Potter* v. *Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 986 [25 Cal.Rptr.2d 550, 863 P.2d 795].)

*Webb* v. *Francis J. Lewald Coal Co.* (1931) 214 Cal. 182 [4 P.2d 532, 77 A.L.R. 675] is instructive. There, our Supreme Court held a plaintiff could recover emotional distress damages after witnessing a truck crash into the

---

[1]My brethren acknowledge the plaintiffs "may have felt some heat, wind and vibration in the few minutes before the crash," but explain, "[I]t would be a gross distortion of their complaint to suggest that they are claiming anything in addition to their emotional distress for being exposed to the possibility of death or injury in an impending plane crash." (Maj. opn., *ante,* at p. 657, fn. 5.) But we must accept as true all of the allegations contained in the complaint. The plaintiffs claim their injuries resulted from fear the plane would crash on them *and* from the heat, wind and vibration. In any event, standing alone, the allegation of fear from imminent peril is sufficient to state a cause of action for emotional distress damages.

building in which she was standing. The court noted the truck did not hit the plaintiff but she nevertheless was injured because she reasonably feared for her own safety. (See also *Cook* v. *Maier* (1939) 33 Cal.App.2d 581 [92 P.2d 434].)

The Supreme Court has not addressed the precise issue we consider—may an airplane crash witness recover for emotional distress damages relating solely to fear for personal safety? However, the Ninth Circuit in *In re Air Crash Disaster Near Cerritos, Cal.* (9th Cir. 1992) 973 F.2d 1490 went one step further. There, the plaintiffs alleged they "were inside the bedroom of their home when they *heard* two sounds like sonic booms . . . ." (*Id.* at p. 1494, italics added (dis. opn. of Rymer, J.).) They maintained they suffered severe and lasting emotional distress, fright and shock as a result of fear for their own safety. The district court dismissed the complaint, finding it failed to state a cause of action under California law. Relying on *Webb* and *Cook*, the Ninth Circuit reversed, holding California law "quite clearly [suggests plaintiffs] . . . have stated a valid claim." (*Id.* at p. 1491.)

*Cerritos* is noteworthy for two reasons. First, of course, the majority held the plaintiffs could recover emotional distress damages after merely *hearing* a crash. Second, even the dissent acknowledged California law would allow recovery if the plaintiffs had *seen* the crash. (*In re Air Crash Disaster Near Cerritos, Cal., supra,* 973 F.2d at pp. 1494-1495 (dis. opn. of Rymer, J.).) The dissenting judge parted company with her colleagues only because, as she explained, the cases upon which the majority relied do not extend to plaintiffs who "were unaware of the injury-causing event that threatened their safety. [¶] . . . [¶] . . . [P]laintiffs who may recover on account of fear for their own safety will have appreciated why they are in danger." (*Id.* at p. 1496 (dis. opn. of Rymer, J.).)

## THE MAJORITY OPINION

The Supreme Court says a car crash spectator can recover emotional distress damages. The Ninth Circuit says plaintiffs can recover if they are emotionally distressed after *hearing* a plane crash.

Why do my colleagues conclude these plaintiffs cannot recover? The majority sees a difference between car crash and airplane disaster witnesses. They say those who operate a car must be more "aware of the surrounding area and nearby property" because "[t]he risk to bystanders is different . . . ." (Maj. opn., *ante,* at p. 667.) Moreover, they say the standard is different because while results of airplane crashes are worse than car crashes, airplane operators should be held to a lower standard of care

because pilot's negligence is "at worst, negligence in light of a very high standard of required performance—rather than any kind of moral indifference to the possibility of injury." (Maj. opn., *ante*, at p. 659.) I fail to appreciate their distinction.

Simply stated my brethren are unimpressed with California Supreme Court authority, suggesting the high court should rethink its position and recognize *its rationale is "strained" because it "assume[s] that the trauma leading to the emotional distress caused some unspecified 'nerve damage' or 'shock to the nerves' which took the case out of the emotional and into the physical."* (Maj. opn., *ante*, at p. 663.) And, they find the Ninth Circuit just plain wrong. "With due respect to the Ninth Circuit, we must disagree . . . California tort case law [does not permit] emotional distress damages . . . *whenever* one reasonably fears for one's own safety . . . ." (*Id.* at p. 661, original italics.)

When cleansed of its fictional and historical rhetoric, the majority opinion affirms the trial court's sustaining of the demurrer because the justices reject what they label the "loosey-goosey" concept of emotional distress. (Maj. opn., *ante*, at p. 658.) Actually, my brethren are just unimpressed with "weak" people. As they say, "[T]ort law cannot countenance [an] . . . 'eggshell psyche.' "[2] (*Ibid.*) If they had their way, we would all be certified war heroes. We certainly would not reward those who succumb to fear as a result of someone else's negligence.

My colleagues miss the point. Their feelings about emotional distress damages are irrelevant. The Supreme Court sets the standard we are to follow. I would reverse the granting of the demurrer and permit the trier of fact to decide if the defendants were negligent and, if so, whether the plaintiffs were damaged as a result.

---

[2]The majority has turned this doctrine on its ear. As every first year law student learns, tortfeasors take their victims as they find them. (Prosser & Keeton, Torts (5th ed. 1984) § 43, p. 292 [defendant liable for death of plaintiff, even though normal victim would have suffered only a bump on the head]; see also *Sloane* v. *Southern Cal. Ry. Co., supra,* 111 Cal. at p. 683 ["Whether the defendant . . . knew of (the plaintiff's) susceptibility to nervous disturbance was immaterial."].)