# FOR PUBLICATION



FILED
Apr 03 2014, 9:51 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**KEVIN W. BETZ**
**SANDRA L. BLEVINS**
**JAMIE A. MADDOX**
Betz + Blevins
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
500 FESTIVAL, INC.:

**RANDALL W. GRAFF**
Kopka, Pinkus, Dolin, & Eads, PC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
FEDERAL EXPRESS CORP.:

**STEVEN E. SPRINGER**
**MARK D. GERTH**
Kightlinger & Gray, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JEFFREY M. MILLER and CYNTHIA S. MILLER, | ) | |
| Appellants-Plaintiffs, | ) | |
| vs. | ) | No. 49A02-1307-PL-619 |
| FEDERAL EXPRESS CORPORATION and 500 FESTIVAL, INC., | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Michael D. Keele, Judge
Cause No. 49D07-1003-PL-014761

April 3, 2014

OPINION – FOR PUBLICATION

**MATHIAS, Judge**

Jeffrey M. Miller and Cynthia S. Miller ("the Millers") appeal the Marion Superior Court's grant of summary judgment in favor of Federal Express Corporation ("FedEx") and 500 Festival, Inc. ("500 Festival") on the Millers' claim of defamation and intentional infliction of emotional distress. The Millers appeal, claiming: (1) that the Defendants failed to preserve evidence, and (2) that the Defendants are not immune from suit under the federal Communications Decency Act.

We affirm.

**Facts and Procedural History**

From 1994 until his retirement in 2008, Jeffrey Miller ("Miller") was the president of Junior Achievement of Central Indiana ("JACI"). After his retirement, Miller acted as president of the Experiential Learning and Entrepreneurship Federation ("ELEF"), which is a separate organization from JACI, but which works with JACI. In the spring of 2008, Miller announced a joint project between JACI, ELEF, and Ivy Tech Community College ("Ivy Tech"), which provided for ELEF to construct a culinary school on JACI property which Ivy Tech would then lease. Construction on the building began in 2009, but was stopped in 2010 when the primary financial backers of the project stopped providing the necessary funds. This was allegedly due to defamatory statements made by Jennifer Burk ("Burk") and Brian Payne ("Payne"), who are co-defendants in the Millers' current action.[1]

---

[1] Burk succeeded Miller as president of JACI, and Payne was the president of the Central Indiana Community Foundation, Inc. ("CICF").

What happened next is the focus of the current controversy. On March 18, 2010, the Indianapolis Business Journal ("IBJ") published an article on its website regarding the allegations and controversy surrounding the construction of the culinary school. Several comments regarding this article were posted to the IBJ website. The Millers allege that several of these comments were defamatory.

One comment, posted by a user with the screen name "JA Fan" on March 19, 2010, read:

> The new CEO [Burk] has inherited a mess not of her doing. The former CEO [Miller] and finally-fired VP's misuse (for their own personal gain) of funds that were dedicated to educating Indiana children are at the very least an embarrassment to the dedicated staff who have continued to push on, and most likely a criminal act. If you were a donor or sponsor in the last decade to these guys, an audit is definitely in order. Hang in there, Jennifer Burk!"

Appellant's App. pp. 82.

On March 23, 2010, a user with the screen name "Really?" posted a comment which read in relevant part:

> Article- "ELEF is the owner (you would have to be to sign construction contracts worth millions) of the N. Keystone building and Junior Achievement's partner in receiving the $3 million grant. That foundation exists solely to benefit (raise money for) Junior Achievement, and until recently, was overseen by Junior Achievement's managers (Miller). Junior Achievement took on the culinary school project, under longtime CEO Jeff Miller (because in addition to educating Indiana children in business and financial responsibility, teaching adults to cook for others has long been part of the JA mission. Just call the national office and ask, I'm sure its true). He retired but continued to serve as president of the ELEF (money) through last year." Article cont.- "Miller said his role last year was to raise additional donations for the $7 million culinary school project and oversee day-to-day construction activities." Does this include paying the contractors? As the fundraiser and key money guy, probably has an eye on revenue and expenses. Article-"'I was the project manager, but I didn't

3

have any communication about this stopping of money,' he said." Comment quote from other post-"what is so depressing and unfair is that the subcontractors were never told the funds were suspended and JACI, ELEF and CICF let them keep working." Article-"The community foundation informed JA in writing on Nov. 24 that all future payments under the grant would be suspended until 'issues' were resolved." Probably wasn't the first or only communication. If they told JA, who did not own the building or sign the construction contracts, I'm pretty sure as a tenant with an interest in what's happening to the building, they would notify the Landlord, President Miller (who did the deal to bring Ivy Tech to the building, who also took money to fund the construction, who was also the "project manager" responsible for day-to-day operations) that his project is going to be halted and his building left in a mess. Now a storied and critical organization is a mess in his wake. Was it the great philosopher, Steve Miller, who said, "Go on, take the money and run!"? Perhaps a relative?

Appellant's App. pp. 82-83. Another comment was posted on April 6, 2010,[2] by someone using the online handle of "Concernd." This person posted a comment that read, "These guys are crooks (Jeff Miller, Victor George and other parties) and have been robbing from our community using kids as there [sic] hook. I hope they go to jail!!!!" Appellant's App. p. 84.

During discovery, the Millers learned that the first two comments were made by Dave Wilson ("Wilson"), the vice president of corporate sponsorship at 500 Festival. He used a computer owned by 500 Festival and located at 500 Festival offices to make these comments. The IP address from which these comments were posted was assigned to 500 Festival by AT&T, 500 Festival's internet service provider ("ISP"). The third comment was made by an unknown person from an IP address assigned to FedEx. The IP address

---

[2] By the time of this comment, the Millers had already filed suit against Burk, Payne, and JACI.

4

was not traceable to any specific user, but instead belonged to one of FedEx's proxy servers which filtered internet traffic from tens of thousands of FedEx users.

On February 25, 2011, the Millers amended their complaint to add 500 Festival and FedEx as defendants. On November 23, 2011, the Millers served FedEx with interrogatories and requests for production. FedEx objected to the scope of these discovery requests and sought a protective order, which the trial court denied. And after FedEx had responded to the Millers' discovery, the Millers took issue with the adequacy of FedEx's response.

On February 21, 2013, FedEx filed a motion for summary judgment. 500 Festival filed a motion for summary judgment one week later, on February 28, 2013. The Millers responded to these motions on April 30, 2013, after having been granted an extension of time in which to reply. In their response, the Millers claimed that they had received inadequate discovery from 500 Festival. The Millers then filed a motion for sanctions against FedEx and 500 Festival on May 22, 2013, claiming that these defendants had spoliated evidence. The trial court held a hearing on the motions for summary judgment on May 22, 2013, and on July 1, 2013, entered summary judgment in favor of FedEx and 500 Festival. The trial court entered a separate order on July 1, 2013, denying the Millers' motion for sanctions against 500 Festival and entered a similar order denying the Millers' motion for sanctions against FedEx on July 5, 2013. The Millers now appeal.

**Summary Judgment Standard of Review**

Our standard for reviewing a trial court's order granting a motion for summary judgment is well settled: a trial court should grant a motion for summary judgment only

5

when the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Altevogt v. Brand, 963 N.E.2d 1146, 1150 (Ind. Ct. App. 2012) (citing Ind. Trial Rule 56(C)). The trial court's grant of a motion for summary judgment comes to us cloaked with a presumption of validity. Id. "'An appellate court reviewing a trial court summary judgment ruling likewise construes all facts and reasonable inferences in favor of the non-moving party and determines whether the moving party has shown from the designated evidentiary matter that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.'" Id. (quoting Dugan v. Mittal Steel USA Inc., 929 N.E.2d 184, 186 (Ind. 2010)). However, a *de novo* standard of review applies where the dispute is one of law rather than fact. Id. On appeal, we examine only those materials designated to the trial court on the motion for summary judgment, and we must affirm the trial court's entry of summary judgment if it can be sustained on any theory or basis in the record. Id.

## I. Preservation of Evidence

The Millers first claim that the trial court erred in granting summary judgment because both of the Defendants failed to preserve evidence for discovery. Specifically, the Millers refer to certain computer records or files that the Defendants had in their possession. As noted by the Millers, our supreme court has recognized that:

> [I]ntentional destruction of potential evidence in order to disrupt or defeat another persons's right of recovery is highly improper and cannot be justified. The intentional or negligent destruction or spoliation of evidence cannot be condoned and threatens the very integrity of our judicial system. There can be no truth, fairness, or justice in a civil action where relevant

6

> evidence has been destroyed before trial. Destroying evidence can destroy fairness and justice, for it increases the risk of an erroneous decision on the merits of the underlying cause of action. Destroying evidence can also increase the costs of litigation as parties attempt to reconstruct the destroyed evidence or to develop other evidence, which may be less accessible, less persuasive, or both.

Gribben v. Wal-Mart Stores, Inc., 824 N.E.2d 349, 354 (Ind. 2005) (citations and internal quotations omitted). But there is no independent cause of action in Indiana for spoliation of evidence by a party to the suit. Id. at 355. Instead, Indiana trial courts have considerable discretion to respond to discovery violations with such sanctions "as are just" under Trial Rule 37(B). Also, "intentional first-party spoliation of evidence may be used to establish an inference that the spoliated evidence was unfavorable to the party responsible." Id. at 351.

Here, in November 2010, before the Millers added FedEx as a defendant, they served FedEx with a non-party discovery request for information regarding the IP address that was used to post one of the comments on the IBJ website. FedEx responded to this request by informing the Millers that the IP address that had been used to post the comment to the IBJ website was that of a proxy server which filtered internet traffic for tens of thousands of users. FedEx also gave the Millers a copy of the FedEx document retention policy for its proxy servers' logs. This policy explained that such archives are stored for one year. In January 2011, before FedEx was added as a defendant, the proxy server at issue was taken out of service by FedEx in the ordinary course of business. Importantly, the Millers did not thereafter ask FedEx to supplement this response or otherwise complain that the response was inadequate. Instead, the Millers amended their

7

complaint to add FedEx as a defendant on February 25, 2011. The complaint, however, did not allege that the commenter was a FedEx employee, was authorized to post the comment, or posted the comment in the scope of his or her employment.

By this time, however, the proxy server had been taken out of service. And the server logs from April 6, 2010, the date when the comment was posted to IBJ, were purged on April 6, 2011, shortly after FedEx was served with the Millers' complaint but pursuant to the retention policy produced by FedEx to the Millers in third-party discovery. Thus, at the time the server logs were destroyed, FedEx had already responded to the Millers' requests for non-party discovery, and the Millers had not complained of FedEx's discovery responses. Moreover, FedEx has never denied that the IP address at issue was associated with its server. Nor had the Millers at that time requested that FedEx preserve the server logs. Under these facts and circumstances, we cannot say that the trial court erred by failing to sanction FedEx for failing to preserve the records of the proxy server.

The Millers also complain, however, that FedEx failed to preserve any electronic records until November 15, 2012, which was over a year after FedEx had been added as a defendant. The Millers' initial, non-party discovery requests were broad—effectively asking FedEx to search for documents relating to the Millers' claims from all 290,000 FedEx employees. FedEx objected to the breadth of these requests, and on July 11, 2012, sent correspondence to the Millers' counsel asking for information to help narrow the discovery requests. The Millers did not respond. Eventually, the trial court ordered the parties to meet and resolve the discovery issues after the Millers filed a motion for sanctions due to FedEx's alleged failure to properly provide discovery. This was done on

8

November 6 and November 15, 2012. Only then did the Millers limit the scope of their requests to seventeen current and former employees of FedEx who had volunteered for JACI. Thus, once the Millers narrowed their discovery requests to a reasonable scope, FedEx began to preserve records pertaining to these identified employees. Again, under these facts and circumstances, we cannot say that the trial court erred by failing to sanction FedEx for its responsiveness to the Millers' discovery requests.

With regard to 500 Festival, however, the situation was different. Relatively early on in the discovery process, Wilson was known to be the employee who used 500 Festival's computer system to post the comments via his Yahoo account. And the Millers added Wilson as a defendant at the same time that they added 500 Festival. Thus, from the beginning of its involvement in this case, 500 Festival knew that one of its employees was also a defendant and had made the comments at the heart of the Millers' claims. Despite this, 500 Festival made no efforts to preserve the contents of Wilson's computer. In fact, 500 Festival replaced Wilson's computer but failed to make a complete archival backup of the contents of the drive(s) on the computer. Instead, it simply relied on its policy that employees save documents to 500 Festival's file server. It also instructed employees to backup any "computer specific" files to a shared drive on the server prior to the change of computers.

Certainly, the better practice for 500 Festival would have been to preserve the contents of Wilson's computer, otherwise known as placing a unilateral "litigation hold" on the computer and its contents. The seminal case in electronic discovery is Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217 (S.D.N.Y. 2003), In Zubulake, Judge

Scheindlin recognized the dilemmas posed by the nature of electronic documents, saying that a corporation, upon recognizing the threat of litigation, need not "preserve every shred of paper, every e-mail or electronic document, and every backup tape," as such a rule would "cripple large corporations . . . that are almost always involved in litigation."

> At the same time, anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary. While a litigant is under no duty to keep or retain every document in its possession . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.

Id. (citation and internal quotation omitted). Further, "if a company can identify where particular employee documents are stored on backup tapes, then the tapes storing the documents of 'key players' to the existing or threatened litigation should be preserved if the information contained on those tapes is not otherwise available." Id. at 218. Thus, after being added as a defendant and identifying co-defendant Wilson's computer at issue in the present case, 500 Festival should have taken measures to preserve the contents of his computer.

Still, 500 Festival notes that the Millers failed to send 500 Festival any request to place a "litigation hold" on the content of Wilson's computer. See Reinbold v. Harris, IP00-0587-C-T/G, 2000 WL 1693792 (S.D. Ind. Nov. 7, 2000) ("Mere ownership of potential evidence, even with knowledge of its relevance to litigation, does not suffice to establish a duty to maintain such evidence."). Again, if the Millers thought the content of Wilson's computer was vital to their case, they could have specifically requested that 500

10

Festival archive the content of Wilson's computer. Thus, it appears that neither the Millers nor 500 Festival did all that they could have done and should have done in order to preserve the contents of Wilson's computer. However, we need not pursue the discovery issues concerning the contents of the hard drive on Wilson's computer, and we do not think that 500 Festival's failure to preserve the contents of this computer required the trial court to deny summary judgment in favor of 500 Festival. Both of these issues are mooted by the fact that both FedEx and 500 Festival are immune from the claims brought by the Millers.

## II. Immunity Under The Communications Decency Act

The trial court granted summary judgment in favor of 500 Festival and FedEx based on its conclusion that these defendants were protected from liability by operation of the federal Communications Decency Act ("CDA"). On appeal, the Millers claim that the trial court's conclusion was erroneous. Because this is strictly a question of law, our review is *de novo*. Altevogt, 963 N.E.2d at 1150.

At issue here is Section 230 of the CDA, which provides:

(a) Findings
The Congress finds the following:
  (1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.
  (2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.
  (3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

11

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

(b) Policy

It is the policy of the United States—

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) Protection for "good samaritan" blocking and screening of offensive material**

**(1) Treatment of publisher or speaker**

**No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.**

**(2) Civil liability**

**No provider or user of an interactive computer service shall be held liable on account of—**

**(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or**

**(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).**

12

(d) Obligations of interactive computer service

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

* * *

(f) Definitions

As used in this section:

(1) Internet
The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2) Interactive computer service**
**The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.**

(3) Information content provider
The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service. . . .

47 U.S.C. § 230 (1998) (bold emphasis added).

In the leading case on Section 230 immunity, the federal Fourth Circuit Court of Appeals in Zeran v. Am. Online, Inc., 129 F.3d 327 (4th Cir. 1997), noted that:

By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as

13

deciding whether to publish, withdraw, postpone or alter content—are barred.

Id. at 330. The Zeran court also noted that the purpose of Section 230 immunity is not difficult to discern:

> Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum.

Id.

Thus, Congress made a policy choice not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages. Id. This is so because interactive computer services have millions of users, and the amount of information communicated via interactive computer services is "staggering." Id. "The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems." Id. Congress considered the weight of the speech interests implicated and chose to immunize providers of interactive computer services to avoid any restrictive effect. Id. This does not mean, however, that the party who actually posts the defamatory message can escape liability. Id. But Congress made a policy choice not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages. Id. at 330-31.

14

Other courts have adopted this broad reading of the protections afforded by Section 230(c). See, e.g., Doe v. MySpace, Inc., 528 F.3d 413, 418-19 (5th Cir. 2008) (holding that operator of social media website was protected by Section 230 from suit by minors who were sexually assaulted by men they met on the site); Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1123-24 (9th Cir. 2003) (holding that an online dating service provider was not liable when an unidentified party posted a false online profile for a popular actress, leading her to receive sexually explicit phone calls, letters, and faxes at home); Batzel v. Smith, 333 F.3d 1018, 1030-31 (9th Cir. 2003) (concluding that operator of a museum security website was protected by Section 230 from suit brought by person allegedly defamed by email posted to the site and its email list because language of Section 230 confers immunity on both providers and users of interactive computer services); Green v. Am. Online (AOL), 318 F.3d 465, 471 (3d Cir. 2003) (holding that web-based service provider was protected by Section 230 from claim by user who claimed he received a computer virus from third party and endured derogatory comments directed at him by other users); Ben Ezra, Weinstein, & Co. v. Am. Online Inc., 206 F.3d 980, 984-86 (10th Cir. 2000) (holding that online service provider was immune from defamation claim based on inaccurate stock information). And even those courts which have not interpreted Section 230(c)'s protection as broadly as the Fourth Circuit in Zupan have still acknowledged that a provider of an interactive computer service cannot be liable as a publisher or speaker of information provided by someone else. See Chicago Lawyers' Comm'n for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 671 (7th Cir. 2008).

15

Thus, the question before us is whether 500 Festival and FedEx qualify as providers of an "interactive computer service" for purposes of Section 230(c)(1). The Millers argue that neither 500 Festival nor FedEx provided an interactive computer service, but are instead employers providing computer services to their employees via third-party ISPs.

Section 230(f)(2) defines an "interactive computer service" to mean "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." The Millers acknowledge the case law that has extended Section 230 immunity to websites such as Google, Yahoo, and Microsoft, but claim that it does not extend to employers who provide access to their employees and others to the internet. The cases that have addressed this question, however, have decided otherwise.

In Delfino v. Agilent Technologies, Inc., 52 Ca.Rptr.3d 376 (Ca. Ct. App. 2006), the plaintiffs sued the employer of a man they claimed had sent them threatening emails and messages posted to online bulletin boards. The trial court granted the employer's motion for summary judgment, and the plaintiffs appealed. The California Court of Appeals noted that no case had yet held that a corporate employer was a provider of an "interactive computer service" for providing internet access to its employees. Id. at 389. The court noted, however, that several commentators had indicated that an employer who provides its employees with internet access through the employer's internal computer

16

system should be considered a provider of an interactive computer service for purposes of the CDA. See id. (citing Zion, Protecting the E–Marketplace of Ideas by Protecting Employers: Immunity for Employers Under Section 230 of the Communications Decency Act, 54 Fed. Comm. L.J. 493, 496 (2002); Garvey, The New Corporate Dilemma: Avoiding Liability in the Age of Internet Technology, 25 U. Dayton L.Rev. 133, 139 (1999)). The California court also noted that "'Internet resources and access are sufficiently important to many corporations and other employers that those employers link their office computer networks to the Internet and provide employees with direct or modem access to the office network (and thus to the Internet).'" Id. (quoting Am. Civil Liberties Union v. Reno, 929 F. Supp. 824, 832-833 (E.D. Pa. 1996), aff'd 521 U.S. 844 (1997)). The Delfino court ultimately concluded that the employer in that case met the definition of a provider of an interactive computer service because "it 'provide[d] or enable[d] computer access by multiple users [i.e., Agilent's employees] to a computer server.'" Id. (quoting 47 U.S.C. § 230(f)(2)).

The Illinois Appellate Court came to a similar conclusion in Lansing v. Sw. Airlines Co., 980 N.E.2d 630, 631 (Ill. App. Ct. 2012), appeal denied, 979 N.E.2d 878 (Ill. 2012). In that case, the plaintiff sued the employer airline, claiming that it had negligently supervised an employee who sent threatening messages. The trial court granted summary judgment in favor of the airline, concluding that Section 230 of the CDA afforded it immunity from the plaintiff's claims that arose from the emails and text messages sent over the internet. The plaintiff appealed and argued that the defendant was an airline, not an ISP, and that when Congress enacted the CDA in 1996, it did not intend

to include within the definition of a provider of an interactive computer service those employers who gave their employees access to the Internet for the purpose of their work. Although the parties in Lansing focused their arguments on whether the airline was an ISP, the court observed that an ISP was neither mentioned nor defined by the CDA. Instead, the proper focus was on whether the airline was a provider of an interactive computer service. The court answered this question in the affirmative:

> We find that, under the plain language of the statute and its broad definition of an ICS [interactive computer service], an employer like defendant qualifies as a provider or user of an ICS because defendant uses an information system or service that multiple users, like defendant's employees, use to access the Internet.

Lansing, 980 N.E.2d at 637. Cf. Kathleen R. v. City of Livermore, 104 Cal. Rptr. 2d 772, 777 (Cal. Ct. App. 2001) (holding that public library was immune from suit under Section 230 because it provided an interactive computer service by enabling multiple users to access the internet through its public computers).

Here, the designated evidence clearly establishes that both 500 Festival and FedEx provide or enable computer access for multiple users on their respective computer networks to access the Internet by means of the servers on each network. We conclude that this is all that is required under Section 230(c)(1) to be considered a provider of an interactive computer service.

Of course, simply because the defendants here have established that they are providers of an interactive computer service does not mean that they are automatically immune from suits. Section 230 of the CDA does not provide blanket immunity for providers of an interactive computer service. Instead, it protects such providers only

18

from claims which seek to hold the provider as a "publisher." Delfino, 52 Cal.Rptr.3d at 388; see also Craigslist, Inc., 519 F.3d at 669 (explaining that Section 230(c) "cannot be understood as a general prohibition of civil liability for web-site operators and other online content hosts."). Instead, for a defendant to claim the protection afforded by Section 230 of the CDA, it must establish three elements: (1) that the defendant is a provider or user of an interactive computer service; (2) that the cause of action treats the defendant as a publisher or speaker of information; and (3) that the information at issue is provided by another information content provider. Delfino, 52 Cal.Rptr.3d at 388 (citing Gentry v. eBay, Inc., 121 Cal. Rptr. 2d 703, 714 (Cal. Ct. App. 2002)).

We have already concluded that both 500 Festival and FedEx are providers of an interactive computer service. And it is clear that the information at issue—the comments posted to the IBJ website—was provided by another "information content provider," which is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet[.]" 47 U.S.C. § 230(f)(3). FedEx's unknown user and 500 Festival's known employee, Wilson, easily fall within this definition.

The final question then is whether the Millers' cause of action treats the defendants as publishers of the information. The Millers' complaint clearly seeks to hold 500 Festival and FedEx liable for what they *published*. See Appellant's App. p. 87 ("Mr. Wilson, 500 Festival, Ms. Hanlon, Mr. Leagre, Ms. Leagre, FedEx, Does #1-3, Mr. Burk, Ms. Steege, Mr. Starr and Ms. Starr, individually and/or in a concerted action among some or all of the Defendants, *published* unfounded statements regarding misuse of funds

19

and other criminal and/or lewd acts on the IBJ website, the Indianapolis Star website and WRTV-6s website"); id. at 88 (same); id. at 89 (same). And despite their references to other doctrines, such as *respondeat superior*, the Millers' actual complaint seeks to hold 500 Festival and FedEx liable as publishers of the statements. Thus, their claims are barred by Section 230(c) of the CDA. See Delfino, 52 Cal.Rptr.3d at 389; Lansing, 980 N.E.2d at 637 (both holding that employers were protected by Section 230(c)(1) from suits seeking to hold them liable for the actions of their employees while using the employers' computer networks to access the internet). Accordingly, the trial court properly granted summary judgment in favor of 500 Festival and FedEx.

**Conclusion**

Although there may have remained a genuine issue of material fact concerning spoliation of evidence under state law, the trial court properly granted summary judgment in favor of 500 Festival and FedEx, finding each to be sued in their capacity as a publisher of the information at issue and concluding that, as such, these defendants were immune from the Millers' claims under Section 230(c) of the federal Communications Decency Act because these defendants are providers of an interactive computer service.

Affirmed.

BAILEY, J., and BRADFORD, J., concur.